UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANIKA TERRY, individually, and as administrator Of the Estate of her unborn child, JOHN DOE, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 09 C 3093 Honorable Judge Dow |
| COOK COUNTY, COOK COUNTY SHERIFF, CERMAK HEALTH SERVICES, et al., | ) ) ) | |
| Defendants. | ) | |

**RESPONSE TO DEFENDANTS' MOTION TO BIFURCATE**

NOW COMES Plaintiffs, **SHANIKA TERRY**, individually and on behalf of her unborn child, JOHN DOE, deceased, by her attorneys, **LAW OFFICE OF MARTIN L. GLINK**, and for her response to Defendants' motion to bifurcate states as follows:

The defendants have filed a joint motion to bifurcate and stay the *Monell* claims and discovery. Defendants are misapplying the facts of the case to the applicable law, which when done properly would not warrant bifurcation or staying of any discovery.

On July 22, 2008 Plaintiff, a pregnant inmate in Cook County Jail, began having abdominal pain and cramping and asked for assistance from the nurses and guards. *Complaint* § 16, 18. For many hours defendants failed to provide any assistance despite continued and ongoing complaint of abdominal pain. Id. § 19. For at least 2 hours prior to 11:00 p.m., she began to have severe vaginal bleeding. Id. § 20. She was taken to St. Anthony ER at around 11 p.m. at which time the nurses could not locate a fetal heart rate. Id.§ 21. Plaintiff was diagnosed with abruption placenta, DIC, and was advised that JOHN DOE was dead upon admission to the hospital. Id. § 22.

1

The complaint states that each Defendant owed a duty to Plaintiff and JOHN DOE, including, but not limited to the following:

- a) In *Duran v. Dart,* … Cook County entered into a consent decree in which it agreed to improve its health care services for its inmates.
  …
- e) … officials may not … unreasonably delay .. with medical treatment for inmates. …
- f) Jail officials may not offer only cursory medical care when the need for more serious treatment is obvious.
  …
- h) The defendants owed a statutory duty and special duty of care to Plaintiff and her Decedent, the unborn child, to furnish, provide or summon urgent needed medical and hospital care for Plaintiffs, who were in their sole care and custody and who were unable to obtain, summon, provide, afford or secure immediate medical care, treatment and attention of the serious condition. Id. § 24.

With knowledge of Plaintiffs' worsening, physical condition, Defendants, negligently breached their duty owed to the Plaintiffs when they:

- a) failed … to … provide … or summon …or afford reasonable and necessary medical … care, … for the … physical condition(s) of Plaintiff and her unborn child JOHN DOE, after hearing her complain of severe abdominal pain with her pregnancy;
- b) failed to summon a doctor, or medical care;
- c) failed to transport Plaintiff to an area hospital until such time that her condition had deteriorated whereby medical care which would have been helpful or effective but which was now ineffective due to the acts or omissions and delays by Defendants and failed to affirmatively preserve Plaintiff's unborn child JOHN DOE's life;
- d) Failed to implement policies and procedures to cure the health care deficiencies that had been identified prior to July 22, 2008;
- e) Failed to provide sufficient budgeting to care for Plaintiff and other inmates;
- f) Failed to keep notes of any of the care that may have been provided to Plaintiff, thereby affecting the continuum of care;
- g) Failed to provide sufficient staffing to care for Plaintiff and other inmates;
- h) Failed to train its staff on how to recognize, diagnose and treat the signs and symptoms of the condition which Plaintiff was suffering from;
- i) Failed to comply with national standards and the Illinois Department of Corrections Standards for Jails and Lock Up Facilities and Prisons; Id. § 25.

Count II alleges violation of Plaintiff's civil rights, for their reckless disregard and violation of the Illinois and Federal Constitution. Count III alleges willful and wanton conduct resulting in wrongful death of the fetus and injuries to Plaintiff. Count IV is a survival count.

### National Commission on Correctional Health Care

According to the Standards for Health Services in Jails, the standard is that "Inmates have access to care to meet serious medical … needs;" "The responsible health authority identifies and eliminates any barriers to inmates receiving health care." "Access to care means that in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered." J-A-01

Under J-A-04 administrative meetings and reports – the standard is for the jail and its health services to hold meetings. Compliance indicators include that the meetings are held quarterly with minutes or summaries retained, and statistical reports are made monthly. Monthly statistical reports are compiled and used to monitor trends in the delivery of health care, including the volume, proportion of services and are used to plan staffing, space and other needs.

According to J-A-06, a comprehensive quality control program must be included, which establishes multidisciplinary quality improvement committee that meets quarterly and designs quality improvements, discusses results, and implements corrective actions. Further it must review access to care, emergency care, inmate grievances; and must have minutes. The program includes a process quality improvement study and an outcome quality improvement study, both of which identify areas in need of improvement and effect remedial actions.

Pursuant to J-E-10 – when patients are escorted for medical treatment, the standards is that it is done safely and in a timely manner. This means that the facility has sufficient staff to escort patients when in need. "The principal to health access to care rests on the ability of inmates to

request and receive services in a timely fashion. When required for security purposes, custody administration ensures that personnel are available to escort patients from housing to clinic areas." Id. J-G-03 also requires that sufficient staffing for the infirmary is set as determined by the number of patients, severity of illness and level of care.

### John Howard Report in *Durran v. Sheriff*

Not only are there standards, but Cook County has been subject to Court Monitoring in Duran v. Sheehan 74 C 2949 for years. The requested information regarding funding and staffing has always been an issue for the CCJ. The John Howard Reports in Duran continually make mention of the funding inadequacies and how they relate to the quality of care. In 2005, procedures for health problems were cut which were related to budget constraints. **Exhibit 1,** Executive Summary, Court Monitoring Report for Duran v Sheahan, 74 C 2949, May 2005 at 15. There was a concern of reducing health services to fit within dwindling budget limitations. Id.

The Sheriff's Department in its 2007 and 2008 budget indicate that they strive to meet or exceed the standards of the American Correctional Association and Illinois Department of Corrections Jail and Detention Standards Unit and **the John Howard Association. Exhibit 2.**

The January 30, 2007 John Howard report, **Exhibit 3 at 2,** noted that health care for inmates, which already has been significantly and irrationally cut was facing new reductions. Certain treatment for female inmates was being eliminated. Id. President Stroger and Chief Simon were summarily dismissing more than ½ the medical staff at Cermak Health Services. The cuts would result in delay in treatment, complications and higher costs. Id. at 3. John Howard foretold the loss of Cermak's accreditation by the National Commission on Correctional Health Care after it learned that the cuts and other changes were violating professional standards. Id. Low and behold, they lost their accreditation.

4

There was no change in the next year. According to the Court Monitoring Report, August 7, 2008, at 42 (**Exhibit 4**), the M.O.M.S. program, (maternity objectives management) had provided residential alternatives for pregnant and postpartum women since 1998. However in April 2007 the program experienced reductions in 2007 because of budget cuts.

Living units in all divisions were not fully staffed between 7 am and 11:00 pm shifts, which resulted in "cross watching," in which one officer oversees 2 units despite the fact that this practice is prohibited. Id. at 73. This shortage resulted in delays in essential activities such as sick call and other health care appointments. Id.at 74. The Sheriff is the one responsible to request the appropriate number of officers while the President and Cook County Board is responsible to fund the request. Id. Division III/VIII the medical units had 352 staff, when they were required to have 410, a 52 staff shortage. Id. at 75. They also noted that in several living units medication rounds were delayed because of a delay in assigning officers to accompany nursing personnel. Id.at 81.

In the several months leading up to August 2008, one of which is July which is the date of the occurrence in the case at bar, there were increased complaints related to medical care, including the care itself, accessibility and quality. Id. at 89. In addition there were chronic and pervasive shortages of nurses and physician assistants. Id. It was the opinion of the John Howard Association that the restrictions on health services caused by the 2007 budget cuts were exacerbated in 2008. Id.at 90. Delivery of prescribed medication was being delayed or missed. Id.at 91.

The health care problems represent some of the more systemic issues affecting health services at CCDOC … They are primarily attributable to years of budget cuts and poor and inconsistent leadership at Cermak. Much of the responsibility for these problems must be placed

5

on the former Interim Medical Director [David Fagus] for most of this period (until July 25, 2008) who participated in the budget cuts and service reductions described… Id. at 93.

In terms of the complaints: the most numerous relate to medical treatment. Id. at 97. In 2007 1,450/2,553 (56.8%) related to medical treatment. Id. at 98. Through April 2008 414/793 (52.2%). Id. at 99. In the 2009 report. page 66, every division of the jail was understaffed between 7 am and 11 pm. **Exhibit 5.** Since April 2008, medical complaints continued to be the most numerous. In July 2008, there were 104/181 (57%) grievances, which was tied for the highest percentage of grievances in 2008.

Evidence of systemic deficiencies in staffing, facilities, record keeping, supervision and procedures can show that unnecessary suffering is inevitable unless the deficiencies are remedied. William J Rold, *The Legal Context of Correctional Health Care,* p.g. 141. **Exhibit 6**, *citing*, *Bishop v. Stoneman* 508 F.2d 1224 (2nd Cir. 1974).

The Complaint further alleges that on July 11, 2008, only 11 days prior to this horrific incident, Thomas Dart received the *U.S. Dept. of Justice Report to Todd Stroger and Thomas Dart*, 7/11/08, in which the U.S. Department of Justice found that the medical care provided by CCJ fell below the constitutionally required standards of care. Defendants admit they received this report (however they deny any allegations of wrongdoing therein). Obviously, this report was in the makings for months prior to being issued. Despite this, nothing was done to increase staffing and/or training. This resulted in Plaintiff not obtaining assistance in a timely fashion which was a cause of the death of the fetus.

Defendants arguments and reliance on cited case law is distinguishable from the case at bar. For the following reasons, defendants' motion should be denied.

# ARGUMENT

**I. Discovery on the *Monell* claims should not be barred because any resolution whether for or against the individual defendants will not dispose of the case against the County.**

Defendants incorrectly argue that the case should be bifurcated as it will be expedient, that it will provide for justice and that should the claims against the individual defendants fail then the case against the County must also fail. The cases cited by defendants deal with excessive force cases; none deal with failure to provide medical treatment. Defendants also failed to cite *Thomas v. Cook County,* 588 F.3d 445 (7th Cir. 2009)*,* a case on point and one which explains the 7th Circuit's road map in bifurcating such cases. Their failure to cite this case is even more telling since one of the attorneys, Andrew Creighton¸ the attorney who argued the appeal in that case, was one of the original attorneys for the County in this case. Their failure to bring this case to the Court's attention is evident since it is the only case on point, is a 7th Circuit precedential decision, and counters every argument that the defendants have made, including their argument that a jury would be confused and automatically find the officers liable if the *Monell* claims are dealt with during the trial. Defendants' arguments are not supported by the facts or case law.

In *Thomas, supra,* the mother brought a §1983 action against the County, the Sheriff and other officers and medical technicians after her son died in the county jail from meningitis. There was a jury verdict of over four million dollars and the court denied the JNOV and motion for new trial by the defendants.

The County was found liable for its unofficial custom and practice that caused the constitutional harm and death of plaintiff; which was the failure to have a system in place to allow for prompt review of inmates medical request forms, the practice of understaffing correctional officers, etc. Id. at 453. As part of the motion of a new trial, defendants argued that it cannot be

7

found liable under *Monell* because none of its employees were found to have violated Smith's constitutional rights. Id. 588 F.3d at 456. The Court did not find this argument persuasive and it found the County's reliance of *Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571 (1986) distinguishable.

The Seventh Circuit in *Thomas* held that the County's attempt to fashion a rule that requires individual officer liability before a municipal can ever be held liable for damages under *Monell* as an unreasonable extension of *Heller.* Id. at 455. The Court held that the actual rule in *Heller* is that a municipality can be held liable under *Monell* even when its officers are not, unless such a finding would create inconsistent verdicts. Id. Therefore, one must look at the nature of the constitutional violation, the theory of municipal liability and the defenses set forth. Id. In *Thomas,* Plaintiff alleged that the failure to timely respond to plaintiff's medical requests caused his injury and violated his right to due process. Id. Plaintiff needed to prove that 1) Plaintiff had a serious medical condition; 2) the defendant was deliberately indifferent to Plaintiff's serious medical needs; and that 3) the defendant's conduct caused harm to Plaintiff. The Court found that a jury could have found that the County employees were not deliberately indifferent to plaintiff's medical needs, but simply could not respond adequately because of the widespread and well documented breakdown in the County's retrieving of medical request forms. Id. at 456. Therefore the verdict was not inconsistent even though the County employees were not found liable and the County was under *Monell.*[1]

Similarly, in the case at bar, a jury could find that the officers and medical professionals simply could not respond to plaintiff's requests for medical assistance in a timely fashion because of underfunding, which caused understaffing. This is a documented concern from the John

---

[1] *See also Bell v. City of Chicago,* (2/3/10) 09 C 4537 Judge Samuel Der-Yeghiayan denying the motion to bifurcate pursuant to the 7th Circuit's road map set forth in *Thomas.* **Exhibit 7.**

Howard Association and the Department of Justice. A jury could find the County liable for creating the environment in which the officers and medical personnel could do nothing more than they did. Therefore, the verdict would be consistent.

Furthermore, the Sheriff and other defendants have filed affirmative defenses in this case, including qualified immunities. **Exhibit 8.** Thus, even if there was an absence of individual liability, the County could still be held liable. *See Lewis v. Downey* 581 F.3d 467, 478 (7th Cir. 2009)(to defeat qualified immunity, the plaintiff must demonstrate that an individual defendant's conduct violated the plaintiff's constitutional rights and that the violated right was clearly established at the time of the misconduct). Therefore, as the Court in *Thomas* noted, such defenses could allow for verdicts in which an individual was not liable, whereas the County was.

If the Court grants the motion, defendants will surely bring a motion for summary judgment and argue that the individual officers did not violate Plaintiff's constitutional rights therefore not only should judgment be entered in their favor but also in favor of the County under their theory that if the officers are not found liable then the County cannot be found liable.

However, even if the officers and personnel are not found liable, that would not be the end of the case against the County. Based on the cases cited in the Complaint, the John Howard reports that are filed in the *Duran* case and the U.S. DOJ's complaint against Cook County for the very same issues during the same period complained of, the County has a widespread practice and policy of failing to respond to medical requests in a timely fashion, as a result of underfunding and understaffing. These issues are relevant not only to the case against the County but also highly relevant in the individual officers' cases. In fact it would be in the best interests of the officers to have such information in the case as they could argue that they failed to respond because of a systemic lack of staff and funding.

The defendants rely on *Nash v. County v. Will*, 2008 US Dist. Lexis 94304 (N.D. of Ill 2008) and *Jones v. City of Chicago,* 1999 US Dist. Lexis 3358 (N.D. Ill 1999). In addition they cite numerous other cases in Fn. 1 in support of the Court's ordering bifurcation. However all these cases dealt with excessive force under the theory that if one cannot prove that the police officers used excessive force against the inmate, they cannot prevail against the County.[2] As stated in *Bell*, *supra,* all these cases were decided prior to *Thomas* and prior to the 7th Circuit providing a road map for the courts to render such decisions.

Defendants are also incorrect in arguing that if Plaintiff is awarded compensatory damages against the individual defendants she would not be entitled to recover additional damages against the County. If plaintiff was awarded zero because the jury did not find that the officers did not act with deliberate indifference, plaintiff could still recover additional compensatory damages against the County if it is found liable.

As to the filing of the certificate of merit, that has absolutely no bearing on whether to bifurcate or not. Plaintiff provided the certificate to provide defendants with a causation expert as required by Fed. Rules of Civil Procedure, and whether Plaintiffs did it early on in the process or later is irrelevant. The certificate merely provides further evidence that the delay in responding to her requests for medical assistance caused the death of the fetus, which goes to the deliberate indifference standard.

Thus, bifurcating the case would only cause waste of the court's time and resources, would not serve the interests of Rule 42(b), and would cause more inconvenience to the parties and

---

2 Defendants cite to *Heller* yet fail to explain the significant part of the ruling in which the Court held that even though it was an excessive force case, the case was bifurcated for trial and the jury was not instructed on the individual officer's affirmative defenses, i.e. good faith nor the qualified immunities. If the jury had been instructed on these defenses a jury could have found that the plaintiff's rights were violated, found that the officer acted in good faith and not liable but could have still found the County liable for policies that caused the harm to plaintiff. *Thomas,* 588 F.3d at 455.

witnesses since they would have to appear at two trials to testify about the same issues and would not serve the interests of justice for anyone. Therefore the Court should not bifurcate the case.

### II. Conducting discovery on the *Monell* claims would not be inefficient but critical for Plaintiff's case.

Defendants argue, without providing any facts, that the discovery as to the policies and procedures, the training, supervision, underfunding and understaffing of the Jail would be overly burdensome. This argument is purely speculative. Regardless of whether liability if found against the officers, the County will still need to respond to the discovery requests for which there is a pending motion to compel before Magistrate Judge Soat Brown. It would not be in the best interest of any of the parties or the Court to stay the discovery and in fact, it would severely prejudice Plaintiffs' case in that we would be unable to procure adequate evidence necessary for the experts to provide opinions on. It would unnecessarily cause the Court to conduct two rounds of discovery, 2 rounds of motion practice, 2 trials at the same time inconveniencing all the witnesses and parties to appear at both trials, which would merely add additional costs to the parties. The evidence of underfunding and staffing, training, etc. will be required in both cases, and the claims and defenses are the same.

Furthermore, contrary to defendant's argument that it would be too burdensome to produce such documentation, the attached reports show that the County has much of the information requested already in producible format. How is it that the County can provide the same information to the John Howard Association who then provides semiannual and annual reports to the *Duran* Court if it is so burdensome and costly? How is it that the U.S. Department of Justice can obtain the information for the years that are relevant in the case at bar? The County's claim that "the scope of this suit would reach far beyond comprehension birthing nothing but an endless cycle of expansion" are purely flag words which they hope that the Court will latch onto, without

11

looking any further. The issues dealt with in the *Duran* Court and US DOJ report are more expansive than the issues being dealt with in the case at bar. The discovery requests in the case at bar are narrowly tailored to deal with factors that contributed and caused the lack of medical care alleged. These requests are surely within the comprehension of Defense counsel as they already have produced such documentation in other cases, which would make producing it to Plaintiff in the case at bar less onerous. Furthermore, such discovery was also allowed in the *Thomas* case, which shows that the County does have the resources to answer such discovery.

As far as the depositions are concerned, Plaintiff plans to only take depositions of persons with knowledge of the relevant issues. It is in plaintiff's best interest to only take depositions of those relevant parties and it would not one any good to take "endless" depositions. The defendants' assertion that we would engage in endless depositions is speculative especially in light of the fact that the defendants have refused to answering discovery requests dealing with who were the supervisors of the officers, what the chain of command was and who was in charge of staffing, budgeting, training and supervising. Without Defendants answering such relevant and simple discovery defendants' assertions are without any basis.

Thus, because the discovery is relevant against, or on behalf, of the officers claims and defenses, as well as the County, because the case would proceed against the County regardless of what occurs with the individual officers and because of the prejudice to plaintiffs if discovery was stayed, the Court should deny defendants' motion to stay *Monell* discovery.

### III. Bifurcating this case would greatly prejudice Plaintiffs.

Bifurcating the *Monell* claims from the individual officers and employees' case would prejudice Plaintiff and their ability to prove their case. As the *Howard* case makes clear, juries are able to examine the facts and determine whether the officers and employees were acting with

12

indifference to the needs of Plaintiff or whether they were doing their best given the circumstances of which the County through understaffing and underfunding has created for them and the inmates within the Jail system. This can no more plainly be seen in a review of the John Howard reports which explain that this is what was going on during and before the time Plaintiff was incarcerated. Defendants' citation to *Myatt* 816 F. Supp. at 1264, again is irrelevant to the case at bar since that was an excessive force case and prior to the *Thomas* case being decided.

The complaint alleges that there was a delay between the time Plaintiff began complaining of symptoms and the time that she was treated. According to the standards and the Court monitors, as noted above, one of the primary reasons for delay in treatment of inmates is staffing which is a result of underfunding. This evidence is required to prove the damages in the individual case. This is evidence in which an expert will need to rely upon to determine whether the Jail breached the standard of care in staffing the jail to be able to timely respond to Plaintiff's complaints. The expert will need to examine the employees personnel files to find out if they were qualified and had the required continued education courses. The expert will need to review the data to find out if the Jail was responding to deficiencies or not, and by not responding to them, made the injuries to the Plaintiff at bar inevitable. By staying discovery, all such evidence will be unavailable and Plaintiffs will be limited to a one time event which by itself fails to explain the entire story which led to the death of her fetus. This is exactly what defendants want which prejudices Plaintiffs' case.

Discussing the widespread failures, understaffing and underfunding which creates the breakdown in responding to medical requests is the only way that this case can be tried. Defendants are simply attempting to have this Court enter an order and begin creating a rule that the 7th Circuit in *Howard* has already rejected.

## CONCLUSION

WHEREFORE, Plaintiff, SHANIKA TERRY individually and as administrator for the Estate of Her Unborn Child JOHN DOE, prays that this Honorable Court deny defendants' motion to bifurcate and stay discovery, and for such other and further relief as this Court deems just and fit.

Respectfully Submitted

By: */s/ Michael Rothmann*
Michael Rothmann

**LAW OFFICE OF MARTIN L. GLINK**
3345 N. Arlington Heights Road, Suite G
Arlington Heights, Illinois 60004
(847) 394-4900